[Cite as *State v. Charlton*, 2014-Ohio-1330.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 12CA010206 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JEREMIAH A. CHARLTON | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 11CR083022 |

DECISION AND JOURNAL ENTRY

Dated: March 31, 2014

MOORE, Presiding Judge.

{¶1} Defendant, Jeremiah A. Charlton, appeals from the judgment of the Lorain County Court of Common Pleas. Although two members of this Court agree with Mr. Charlton that his conviction is against the manifest weight of the evidence, because the Ohio Constitution requires the concurrence of three judges for a reversal, this Court affirms Mr. Charlton's conviction.

I.

{¶2} Mr. Charlton was indicted on one count of rape. He pleaded not guilty and demanded a jury trial. Just before trial, Mr. Charlton invoked his right to self-representation; the trial court made defense counsel available to Mr. Charlton as an attorney advisor. After the State rested, Mr. Charlton re-invoked his right to counsel. Defense counsel rested without putting on evidence, and then conducted his closing argument.

**{¶3}** The jury deliberated until it informed the trial court that it was deadlocked. The trial court instructed the jury to continue deliberating. *State v. Howard*, 42 Ohio St.3d 18 (1989), paragraph two of the syllabus. Thereafter, the jury found Mr. Charlton guilty.

**{¶4}** The trial court sentenced Mr. Charlton to a total of eight years of incarceration. Mr. Charlton now raises seven assignments of error for our review. We have re-ordered and consolidated certain assignments of error to facilitate our discussion.

II.

**{¶5}** Initially, we note that Mr. Charlton has presented his arguments before this Court pro se. With respect to pro se litigants, this Court has observed:

> [P]ro se litigants should be granted reasonable leeway such that their motions and pleadings should be liberally construed so as to decide the issues on the merits, as opposed to technicalities. However, a pro se litigant is presumed to have knowledge of the law and correct legal procedures so that he remains subject to the same rules and procedures to which represented litigants are bound. He is not given greater rights than represented parties, and must bear the consequences of his mistakes. This Court, therefore, must hold [pro se appellants] to the same standard as any represented party.

(Internal citations omitted.) *Sherlock v. Myers*, 9th Dist. Summit No. 22071, 2004-Ohio-178, ¶ 3; *Countrywide Home Loans Servicing, L.P. v. Murphy-Resling*, 9th Dist. Summit No. 25297, 2010-Ohio-6000, ¶ 4.

**{¶6}** Accordingly, while this Court has made every effort to determine and address the merits of Mr. Charlton's contentions, he is subject to the same rules and procedures as if he were represented by an attorney. With this in mind, we proceed to review Mr. Charlton's assignments of error.

**ASSIGNMENT OF ERROR I**

THE STATE ADDUCED INSUFFICIENT EVIDENCE TO SUPPORT [MR. CHARLTON]'S CONVICTION AND THAT THE CONVICTION IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE IN

VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE STATE OF OHIO CONSTITUTION.

{¶7} In his first assignment of error, Mr. Charlton argues that his conviction is not supported by sufficient evidence and is against the manifest weight of the evidence.

{¶8} The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When considering a challenge to the sufficiency of the evidence, the court must determine whether the prosecution has met its burden of production. *Id.* at 390 (Cook, J. concurring). The relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶9} Here, Mr. Charlton was convicted of rape in violation of R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" includes vaginal intercourse. R.C. 2907.01(A). "Penetration, however slight, is sufficient to complete vaginal * * * intercourse." R.C. 2907.01(A). R.C. 2901.01(A) defines "force" as "any violence, compulsion or constraint physically exerted by any means upon or against a person or thing."

{¶10} In its case-in-chief, the State produced the testimony of the victim, L.A., and two of L.A.'s adult children. L.A. testified that Mr. Charlton approached her while she was outside with her dog doing yard work. When she went inside with her dog, Mr. Charlton followed her, uninvited, and asked her for money. L.A. said she had no money and walked upstairs to use her bathroom. When she came out of the bathroom, Mr. Charlton grabbed her, pulled her into a

darkened bedroom, threw her onto the bed, ripped off her clothes, and raped her. Considered in a light most favorable to the state, this evidence was sufficient to prove rape. We now consider whether Mr. Charlton's conviction was against the weight of the evidence.

{¶11} When a defendant asserts that his conviction is against the manifest weight of the evidence, this Court must review the entire record and weigh the evidence. Our job is not to simply review the evidence. Rather, this Court must consider the credibility of the witnesses. Critically in this case, we must consider the reasonable inferences of the testimony. We are not to consider the evidence in the light most favorable to the State, as we would when reviewing the evidence to determine whether it is sufficient. Instead, the judges of this Court must determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). The Ohio Supreme Court has identified a number of factors to be considered when analyzing whether a conviction is against the weight of the evidence. "These include whether the evidence was uncontradicted, whether a witness was impeached, what was *not* proved, that the reviewing court is not required to accept the incredible as true, the certainty of the evidence, the reliability of the evidence, whether a witness' testimony is self-serving, and whether the evidence is vague, uncertain, conflicting, or fragmentary." (Emphasis sic.) *State v. Apanovitch*, 33 Ohio St.3d 19, 23-24 (1987), citing *State v. Mattison*, 23 Ohio App.3d 10 (8th Dist.1985).

{¶12} It has been said that this Court sits as a "thirteenth juror" when reviewing the evidence and reversing because the conviction is against the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387. We have done that here. Two of us are convinced that the jury resolved the conflicting evidence unreasonably. Because of the importance of the right to a jury trial, the

Ohio Constitution requires that we be unanimous in order to reverse the jury's verdict as against the weight of the evidence. *Id.* at paragraph four of the syllabus. Because we are not, this Court must sustain Mr. Charlton's assignment of error but affirm his conviction.

{¶13} There could not have been two more different stories about what happened at L.A.'s house that lead to this trial. L.A. testified that Mr. Charlton approached her while she was doing yard work with her dog, snuck into her house after her, surprised her when she exited the bathroom, threw her on a bed, and raped her. In short, in her direct examination, she described a random attacker who quickly gained unauthorized access to her house and raped her, a terrible experience at the hands of an anonymous attacker.

{¶14} Mr. Charlton, who was proceeding pro se at this point, cross-examined L.A. She confirmed that she did not discuss anything personal with him during the attack. Mr. Charlton's questions, and L.A.'s answers, however, tell a different story about what happened that day. Through his questions, he demonstrated wide knowledge about her family, including her two sons, her brother-in-law, and her ex-husband.

{¶15} Mr. Charlton asked L.A. about her brother-in-law – by name. Mr. Charlton asked L.A. about one of her sons, who he also identified by name. He asked about another son, by name. He knew even more about this son, like which steel mill he worked at. He also asked her about the time that her son took her to buy a new Chevrolet car for herself and a new Chevrolet truck for himself.

{¶16} Mr. Charlton asked L.A. about her ex-husband. He asked if she was owed child support by him. She said that Mr. Charlton was correct. Once again, Mr. Charlton was correct about another private, personal detail of L.A.'s life.

{¶17} Mr. Charlton also knew about other personal details. For example, he asked L.A. about whether she had bowled at a particular bowling alley. Again, L.A confirmed that he was correct.

{¶18} Mr. Charlton asked L.A. about the first day they met, the day that he stopped to ask about mowing her lawn. He knew that L.A.'s son had a red car in the garage, because L.A. told him to be careful when he put the lawn mower away.

{¶19} As we review this evidence, we remain mindful of the factors set forth in *Apanovitch*. Mr. Charlton began his examination by asking whether L.A. had shared any personal details about her life with him, and she said she had not. Through his questioning, however, he demonstrated that there must have been more than a quick, anonymous attack. L.A. had talked with Mr. Charlton outside of the house, asking him to be careful when he put the lawn mower in the garage. At some point, they talked about four people in her life, including her sons. She also shared what she liked to do, telling him where she went bowling. We cannot accept that L.A. did not share any personal information with Mr. Charlton because her testimony does not support that. Mr. Charlton's questions effectively impeached her, too.

{¶20} Returning to the trial, Mr. Charlton asked L.A. about one of the most important, personal things in her life, her dog. He asked about the dog's arthritis. L.A. confirmed that her vet had told her that the dog had arthritis. Mr. Charlton knew that she fed her dog chicken breasts. He knew that she called her dog one of the best-fed dogs in the neighborhood because of it. He asked her about the walks that she takes with her dog at the lake. Once again, Mr. Charlton was correct that she took her dog to the lake in the evenings for walks.

{¶21} L.A. did not agree with everything Mr. Charlton asked. She denied that she agreed to pay him $25 to give her dog a heat treatment, and $25 for a massage for herself, so that

he could pay his cell phone bill. She denied that her favorite lotion was aloe vera, saying that it was actually "Aveeno." When he asked whether he had washed her body for her, she answered, "Lord, no. You're a (sic) ugly man." She also denied engaging in consensual sex with Mr. Charlton.

{¶22} Mr. Charlton then asked L.A. about when her children came to the house that day. He asked if they were alone in the home when they arrived and she strangely answered, "No. They didn't tell me that. They said you was running down the street." Both of L.A.'s children testified, however, that Mr. Charlton was in the house with L.A. when they arrived.

{¶23} L.A.'s son testified that his mom answered the door and said, "[w]e have company." This happened, according to L.A.'s direct testimony, after Mr. Charlton had snuck in the house and raped her. When L.A.'s son entered the home, Mr. Charlton was sitting on the couch. Mr. Charlton did not run and he did not hide. Instead, he introduced himself to L.A.'s son and shook his hand. L.A.'s son yelled at L.A., telling her, "I've told you and told you and told you don't talk to strangers, don't let people in your house." L.A. became angry at her son for yelling at her. L.A.'s son further testified that, as Mr. Charlton was leaving L.A.'s home, L.A.'s son overheard him ask L.A., "Are you going to pay me?" L.A.'s son asked him for what she would pay him, and he replied that it was for his "therapy." L.A.'s son informed Mr. Charlton that his mother had no money, and Mr. Charlton then asked L.A. if she wanted him to return next week. After Mr. Charlton left the house, L.A.'s son asked his mom "What did you do?," and that is when L.A. alleged that Mr. Charlton raped her. L.A.'s daughter, who arrived after her brother, also found Mr. Charlton in the home. She said that he did not try to flee from the house. Instead, Mr. Charlton casually left. But he did not just leave. He gave them his name and telephone number on his way out so that L.A. could contact him to provide further heat

treatments to her dog. He also asked whether he should return the following week to perform another treatment. He did not provide false contact information to the family; the information he left was given to the police and that is how he was contacted.

{¶24} Again, we consider this evidence as a "thirteenth juror" and with the *Apanovitch* factors to guide us. Mr. Charlton impeached L.A.'s testimony and demonstrated that it conflicted with the testimony of her son and daughter. He also raised a question about whether L.A.'s testimony was self-serving because she told her son that she was raped only after he yelled at her for allowing Mr. Charlton into her house. Up until that point, the evidence suggests that Mr. Charlton was an invited guest, someone who talked at some length with L.A. and tried to help her dog by providing heat treatments to the dog's arthritic back.

{¶25} We recognize that the jury "is best able to view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30, quoting *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659 (8th Dist.1993). But the jury's credibility determinations were unreasonable in this case. The only evidence of rape came from L.A.'s testimony. Obviously, in many cases, the victim's testimony will be the only evidence, and that testimony is generally sufficient to prove the crime and to convince the court of appeals that the conviction is not against the weight of the evidence. In this case, however, we are not convinced.

{¶26} L.A. testified on direct examination to a senseless attack by a stranger. Mr. Charlton, however, demonstrated through his questions that he knew far more than a stranger would know about his victim, her family, and her life. He knew intimate details that a rapist could not learn as he raced from the house. He remembered the names of her relatives and

where one son worked. He knew about a shopping trip she had taken with her son to buy a car. He knew about her ex-husband who owed her support. These are the things that one learns in a conversation that lasts for some time, not during the rape that L.A. described during her direct examination.

{¶27} One of the most compelling things we observed from reviewing the trial testimony is how Mr. Charlton left L.A.'s home. He did not run when her son and daughter arrived. He did not make threats or threatening gestures. He did not fabricate a story about why he was there or what he was doing. Instead of doing any of those things, Mr. Charlton shook the hand of L.A.'s son and introduced himself. And then he gave his name and telephone number to L.A.'s daughter so that they could call him to return. These are not the acts of the rapist described by L.A.

{¶28} We note that we are apparently not alone in our concern about the evidence presented at trial. The trial court judge recognized this when, in overruling Mr. Charlton's Crim.R. 29 motion, the judge stated, "I will say that there are, in the Judge's mind, some great issues of credibility about the testimony of the victim, but it's still an issue of fact for the jury to determine[.]"

{¶29} We have reviewed the evidence presented at trial. We have thought about the credibility of the witnesses. We have considered the reasonable inferences. Two of us believe it was unreasonable for the jury to convict Mr. Charlton.

{¶30} We have concluded that the jury was unreasonable in its consideration of credibility. Accordingly, after reviewing the entire record, weighing the inferences, and examining the credibility of witnesses, we believe that the jury clearly lost its way and created a manifest miscarriage of justice in finding Mr. Charlton guilty of rape. Therefore, to the extent

that Mr. Charlton argues that his conviction was against the manifest weight of the evidence, we agree. Nonetheless, as this panel is not unanimous in its decision sustaining Mr. Charlton's assignment of error as to the manifest weight of the evidence, this decision does not reverse Mr. Charlton's conviction. *Thompkins*, 78 Ohio St.3d at paragraph four of the syllabus.

## ASSIGNMENT OF ERROR IV

[MR. CHARLTON] WAS DENIED A FAIR TRIAL BY THE PROSECUTOR'S FAILURE TO DISCLOSE "BRADY MATERIAL," "DISCRIMINATORY PROSECUTION[,]" AND "MIS-CHARACTERIZATION" OF THE EVIDENCE IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATE[S] CONSTITUTION, ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

**{¶31}** In his fourth assignment of error, Mr. Charlton argues that he was denied a fair trial based upon: (1) the State's failure to disclose *Brady* material, (2) discriminatory prosecution, and (3) the State's mischaracterization of the evidence during closing argument. We will discuss these arguments separately.

*Brady* Material

**{¶32}** Mr. Charlton relies on *Brady v. Maryland*, 373 U.S. 83 (1963), to argue that his rights were violated when the State failed to disclose evidence. Pursuant to *Brady*, the State may not withhold "material, exculpatory evidence," as doing so offends a criminal defendant's due process rights. *State v. Moultry*, 9th Dist. Summit No. 25065, 2010-Ohio-3010, ¶ 9. "However, it is [the d]efendant's burden to establish that the evidence is both favorable and material and that there is a reasonable probability that the outcome would have been different if the evidence had been provided." (Quotations and citations omitted.) *Id.* at ¶ 9.

**{¶33}** In his assignment of error, and within his argument in support, Mr. Charlton references "*Brady* [m]aterial" which the State purportedly had in its possession, which was favorable to him, and which deprived him of a fair trial. In his statement of the issues presented,

Mr. Charlton alludes to "[a]ctual crime scene pictures," and a "lotion bottle, DNA [t]est [r]esults, [and] EMS [r]eports and [s]tatements[.]" However, Mr. Charlton does not specify in his argument in support of his fourth assignment of error which of this evidence was exculpatory or when this evidence was discovered. Accordingly, we cannot say that the State engaged in a *Brady* violation.

<u>Discriminatory Prosecution</u>

{¶34} Mr. Charlton further sets forth in his assignment of error that the State engaged in discriminatory prosecution. "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *State v. Ross*, 9th Dist. Lorain No. 09CA009742, 2012-Ohio-536, ¶56, quoting *State v. Sanchez*, 9th Dist. No. 09CA009582, 2010-Ohio-4660, ¶ 33. "To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *State v. Getsy*, 84 Ohio St.3d 180, 203 (1998). In his merit brief, Mr. Charlton does not provide an argument that he was singled out for prosecution on the basis of a constitutionally impermissible standard. Pursuant to App.R. 16(A)(7), the brief of an appellant shall include "[a]n argument containing the contentions of the appellant * * * and the reasons in support of the contentions * * *." Where an appellant fails to develop an argument in support of his assignment of error, "we will not create one for him." *State v. Harmon,* 9th Dist. Summit No.

26426, 2013-Ohio-2319, ¶ 6, citing *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support [an] assignment of error, it is not this court's duty to root it out."). Accordingly, to the extent that he maintains that the State engaged in selective prosecution, his fourth assignment of error is overruled.

Closing Argument

{¶35} Mr. Charlton further argues that the State mischaracterized the evidence during closing argument, when the prosecutor referred to him as a "con man" and repeatedly referenced that Mr. Charlton wore hospital scrubs when he approached L.A. on the date of the incident. However, the defense did not object to these remarks in closing argument.

{¶36} "An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *State v. Williams* 51 Ohio St.2d 112 (1977), paragraph one of the syllabus. Therefore, Mr. Charlton has forfeited this issue. Further, we do not reach the merits of his contentions because he did not argue plain error to this Court. While a defendant who forfeits such an argument still may argue plain error on appeal, this court will not sua sponte undertake a plain-error analysis if a defendant fails to do so. *See State v. Hairston*, 9th Dist. Lorain No. 05CA008768, 2006-Ohio-4925, ¶ 11.

{¶37} Accordingly, Mr. Charlton's fourth assignment of error is overruled.

**ASSIGNMENT OF ERROR III**

[MR. CHARLTON] WAS DEPRIVED OF COMPULSORY PROCESS IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶38} In his third assignment of error, Mr. Charlton argues that the trial court erred in prohibiting him from calling witnesses and presenting evidence. We disagree.

**{¶39}** "Although a criminal defendant has the right to present witness testimony on his behalf, a trial court may 'exclude such evidence when the orderly administration of justice is threatened by the accused's failure to promptly disclose witnesses." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 30, quoting *State v. Moon*, 74 Ohio App.3d 162, 169 (9th Dist.1991). "The rules of discovery, and more specifically Crim.R. 16, imbue trial courts with the discretion to exclude testimony that is not disclosed in a timely manner in order to prevent surprise and ensure a fair trial." *Calise* at ¶ 30, citing *State v. Barrios*, 9th Dist. Lorain No. 06CA009065, 2007-Ohio-7025, ¶ 18. "Exclusion is a permissible sanction 'as long as it would not completely deny the defendant his constitutional right to present a defense.'" *Barrios* at ¶ 18, quoting *State v. Sinkfield*, 2d Dist. Montgomery No. 18663, 2001 WL 1517314, *8 (Nov. 30, 2001).

**{¶40}** Here, just prior to the commencement of trial, when Mr. Charlton invoked his right to self-representation, he indicated to the trial court that he intended to call an expert witness and to produce certain diagrams and drawings. The State responded that Mr. Charlton had not provided the State with discovery as to the purported expert, nor had he provided the State with copies of his exhibits. The trial court inquired as to the identity of the expert and nature of the exhibits that Mr. Charlton intended to use. During this discussion, Mr. Charlton stated:

> I'll be just fine. Just my exhibits, that one exhibit will be enough. The other witnesses or other expert that I need, I won't even need them.

**{¶41}** The trial court then inquired into the identity of the expert. Mr. Charlton indicated that his expert worked for the FBI and had authored an essay on the behavioral characteristics of victims following a crime. Mr. Charlton then again indicated that he did not

need to call the expert because he had a copy of the expert's essay, which he intended to use during his argument. The following exchange then occurred:

> THE COURT: You would not be allowed to use the article. If you want to review it and use the information in your head –
>
> MR. CHARLTON: All right. That's fine.
>
> THE COURT: -- to ask questions, but you are not permitted; it would be hearsay. You couldn't stand in front of the jury and say there's an expert article written by an FBI agent. You can't do that –
>
> MR. CHARLTON: I'm not going to do that.
>
> THE COURT: -- because that would be hearsay and no opportunity to cross-examine. You can use literature, you can use whatever you want to educate yourself, but what would be admissible in evidence is another question.
>
> MR. CHARLTON: All right.
>
> THE COURT: So you understand that as a part of your case here today, if you wish to proceed to represent yourself, you will, you could face certain evidence that you thought was going to be admitted, will not, may not be admitted because it was not revealed during discovery. Because you did have an obligation, a reciprocal obligation to provide discovery so that both sides could be prepared, so there would be no surprises. That's the idea behind the rule.
>
> MR. CHARLTON: That's fine.

{¶42} During trial, Mr. Charlton only once attempted to introduce evidence, when during cross-examination of L.A., he attempted to show her a diagram, and the State objected. Mr. Charlton explained that the exhibit consisted of a drawing he had made of L.A.'s home to demonstrate where he had given her dog a heat treatment. The court sustained the objection, but permitted Mr. Charlton to question L.A. as to the layout of her home. Mr. Charlton did not again attempt to introduce this or any other exhibit. After the State rested, Mr. Charlton re-invoked his right to counsel. The defense then rested without putting on additional evidence.

{¶43} Mr. Charlton argues that, had he been permitted to present evidence, his witnesses and evidence would have supported statements that he made to law enforcement regarding a heat

treatment he gave to L.A.'s dog on the date at issue. Further, he maintains that his evidence would have established that L.A.'s phone number was saved in his phone under her middle name. Moreover, his witnesses would have established that he earns his living through grant-writing and performing odd jobs.

{¶44} However, in his discussion with the trial court prior to trial, as set forth above, Mr. Charlton did not raise the issue of any witnesses other than the one purported FBI expert. During this pretrial discussion, Mr. Charlton informed the court that he did not need to call this expert, and that he would instead rely on an essay authored by the expert in framing his questions and argument. During trial, Mr. Charlton only attempted to introduce one exhibit, and it does not appear from the record that the trial court's sustaining of the objection to this exhibit was based upon a Crim.R. 16 sanction. Further, the defense declined to put on evidence, and thus we cannot discern how the witnesses were prevented from testifying by the trial court. Accordingly, we cannot agree that the trial court "sanction[ed]" Mr. Charlton or prevented him from putting on a defense. In addition, the record does not disclose a proffer of the content of the Mr. Charlton's witnesses' testimony, save for the limited discussion regarding the FBI expert, so that this Court, assuming any error had occurred, might determine prejudice. Accordingly, Mr. Charlton's third assignment of error is overruled.

### ASSIGNMENT OF ERROR II

[MR. CHARLTON] WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING PRE-TRIAL AND CLOSING ARGUMENTS IN VIOLATION OF HIS RIGHTS UNDER[ ]THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶45} In his second assignment of error, Mr. Charlton argues that he was denied effective assistance of counsel. We disagree.

**{¶46}** This Court must analyze claims of ineffective assistance of counsel under a standard of objective reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). Under this standard, a defendant must show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial [.]" *Strickland* at 687. A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different. *Id.* at 694. In applying this test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689. This Court need not address both prongs of *Strickland* where an appellant fails to prove either prong. *See State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10

**{¶47}** Here, Mr. Charlton maintains that his defense counsel failed to forward his witness and evidence lists to the State prior to trial, and, as a result of this error, he was precluded from calling witnesses and presenting evidence pursuant to Crim.R. 16(E)(3). Further, Mr. Charlton maintains that he was "tricked" into re-invoking his right to counsel after the State rested its case based upon a conversation that he had with his attorney, then acting as his advisor, during a recess. Further, Mr. Charlton argues that defense counsel was deficient for failing to object to improper statements by the State during closing argument.

**{¶48}** Assuming without deciding that defense counsel's actions in failing to turn over the above discovery amounted to deficient performance, Mr. Charlton cannot show the prejudice required to meet the second *Strickland* prong. In regard to the discovery, as determined in our

discussion of Mr. Charlton's third assignment of error, we cannot say that the trial court excluded evidence.

{¶49} With respect to defense counsel "trick[ing]" Mr. Charlton into re-invoking his right to an attorney, Mr. Charlton maintains that, during a trial recess, his attorney advisor manipulated him into re-invoking his right to an attorney, and then failed to put on evidence, which included failing to call Mr. Charlton to testify on his own behalf. However, our review is confined to the record, and we cannot consider purported conversations between Mr. Charlton and his attorney which occurred off the record. *State v. Zupancic*, 9th Dist. Wayne No. 12CA0065, 2013-Ohio-3072, ¶ 4 ("When affidavits or other proof outside the record are necessary to support an ineffective assistance claim, * * * it is not appropriate for consideration on direct appeal.").

{¶50} In regard to defense counsel's failure to object to the statements made by the State in closing argument, we note that "[p]arties are granted latitude in closing arguments * * *." *State v. Frazier*, 73 Ohio St.3d 323, 341 (1995), quoting *State v. Loza*, 71 Ohio St.3d 61, 78 (1994). "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *Frazier* at 341, quoting *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). Mr. Charlton maintains that counsel was ineffective for failing to object to statements made by the prosecutor during closing argument that (1) none of the jurors had indicated during voir dire that they required physical evidence to return a guilty verdict, (2) L.A. was consistent in her testimony, although she was at times confused, (3) Mr. Charlton was wearing scrubs, and (4) Mr. Charlton was a "con man[.]"

**{¶51}** In regard to the first two of these comments, Mr. Charlton has developed no argument as to why these comments were improper, and we decline to construct arguments on his behalf. *See Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support this assignment of error, it is not this court's duty to root it out.").

**{¶52}** In regard to the statement by the prosecutor that Mr. Charlton was wearing scrubs when he approached L.A., the testimony of L.A. supports this statement. Accordingly, defense counsel was not ineffective for failing to object.

**{¶53}** The prosecutor's characterization of Mr. Charlton as a "con artist," arose in closing argument when the prosecutor stated: "[Mr. Charlton] is a con artist; he's manipulative. He could have searched out these issues, he could have looked in a garage and saw that there was a car, ladies and gentleman. He watched her, he saw that she had back issues."

**{¶54}** Trial counsel's failure to object to alleged instances of prosecutorial misconduct does not necessarily constitute ineffective assistance of counsel. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 230; *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 62. Instead, a failure to object may be considered sound trial strategy in that "[a] competent trial attorney might well eschew objecting* * * in order to minimize jury attention to the damaging material." *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 90, quoting *United States v. Payne*, 741 F.2d 887, 891 (7th Cir.1984). Here, we conclude that Mr. Charlton is unable to establish that defense counsel's failure to object to the State's characterization of him as a con artist constituted deficient performance. Defense counsel could have determined that objecting to this statement would have focused the jury's attention on the State's alternate explanation

accounting for Mr. Charlton's knowledge of L.A.'s personal affairs. *See Mundt* at ¶ 90. Therefore, declining to object could have constituted sound trial strategy.

{¶55} Accordingly, Mr. Charlton's second assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT ABUSED IT[S] DISCRETION AND ERRED TO THE PREJUDICE OF [MR. CHARLTON] AND DENIED HIM A DEFENSE IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF [TH]E OHIO STATE CONSTITUTION.

## ASSIGNMENT OF ERROR VI

THE JURY LOST ITS WAY AND ITS VERDICT WAS THE PRODUCT OF AN IMPROPER SUPPLEMENTAL JURY INSTRUCTION.

{¶56} In his fifth assignment of error, Mr. Charlton again argues that the trial court erred in prohibiting him from calling witnesses and presenting evidence. As we addressed this issue in our discussion of his third assignment of error, wherein we concluded that the trial court did not sanction Mr. Charlton, we decline to reproduce our discussion here. Additionally, in his fifth assignment of error, Mr. Charlton argues that the trial court erred in admitting two of the State's exhibits into evidence. Also in his fifth assignment of error, and in his sixth assignment of error, Mr. Charlton maintains that the trial court provided the jury with a coercive *Howard* charge. We disagree.

The State's Exhibits

{¶57} Mr. Charlton argues that the trial court erred in admitting into evidence a photograph of L.A.'s wrist and a photograph of her bed, which L.A. testified accurately depicted bruising to her wrist and the bed on which she claimed Mr. Charlton raped her. Mr. Charlton argues that these photographs should not have been admitted because they were not properly authenticated because they did not contain a date or time to verify when they were taken, and

there existed no proof that they were taken by law enforcement. However, Mr. Charlton does not further develop this argument, and he cites to no authority requiring that photographs contain on them a date or time or that they be taken by law enforcement to be admissible. Accordingly, we overrule this portion of his fifth assignment of error. *See Cardone*, 1998 WL 224934, at *8.

*Howard* Charge

**{¶58}** In *State v. Howard*, 42 Ohio St.3d 18 (1989), paragraph one of the syllabus, the Ohio Supreme Court held that "[t]he traditional *Allen* charge (*Allen v. United States*, [164 U.S. 492, (1896)] * * *) is not a proper supplemental charge to be given to juries in Ohio which have become deadlocked on the question of conviction or acquittal." Instead of the *Allen* charge, the Ohio Supreme Court approved the following supplemental instruction:

> The principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.

*Howard* at paragraph two of the syllabus.

{¶59} Here, during deliberations, the jury indicated to the trial court that it was deadlocked. The trial court then instructed the jury as follows:

> In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of other jurors, each verdict submitted to you should be examined with the proper regard and deference to the opinions of others. It is desirable that this case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe that the case will ever be submitted to a jury more capable or impartial or more intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's opinions with the disposition to be persuaded. Do not hesitate to reexamine your views and change your position of you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not yet been reached. Jurors for acquittal should consider whether or not their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.

Mr. Charlton does not appear to argue that the trial court's charge inappropriately deviated from the *Howard* charge. Instead, he argues that the trial court erred by giving the instruction instead of declaring a mistrial.

{¶60} This Court is aware of no authority which would require the trial court to declare a mistrial upon the first indication by a jury that it cannot reach a verdict, and Mr. Charlton directs this Court to no authority which provides for such a result. Thus, we cannot say that the trial court erred in providing the jury with an instruction that was substantially similar to that which the Supreme Court approved in *Howard*.

{¶61} Accordingly, Mr. Charlton's fifth and sixth assignments of error are overruled.

**ASSIGNMENT OF ERROR VII**

THE CUMULATIVE EFFECT OF NUMEROUS ERRORS DEPRIVED [MR. CHARLTON] OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

**{¶62}** In his seventh assignment of error, Mr. Charlton maintains that the cumulative effect of the above errors deprived him of a fair trial. We disagree.

**{¶63}** Cumulative error exists only where the errors during trial actually "deprive[d] a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. "[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *State v. Hill*, 75 Ohio St.3d 195, 212 (1996), quoting *U.S. v. Hasting*, 461 U.S. 499, 508-09 (1983). To support a claim of cumulative error, there must be multiple instances of harmless error. *State v. Garner*, 74 Ohio St.3d 49, 64 (1995).

**{¶64}** Mr. Charlton argues that, were we to conclude that the trial court erred as he has argued in his assignments of error above, then the cumulative error doctrine applies. However, as we have not found multiple instances of harmless error above, Mr. Charlton's seventh assignment of error is overruled. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 132 (unless there exists multiple errors, the cumulative error doctrine does not apply).

### III.

**{¶65}** Mr. Charlton's first assignment of error is sustained to the extent that he argues that his conviction was against the manifest weight of the evidence. Mr. Charlton's remaining assignments of error are overruled. However, as the panel is not unanimous in its determination

that the conviction was against the manifest weight of the evidence, the judgment of the Lorain County Common Pleas Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

CARR, J.
CONCURS.

HENSAL, J.
CONCURS IN PART AND DISSENTS IN PART.

{¶66} I concur with the majority's resolution of all of Mr. Charlton's assignments of error and with respect to the sufficiency portion of his first assignment of error. For several

reasons, however, I disagree with the majority's conclusion that his rape conviction is against the manifest weight of the evidence as I believe that we are invading the province of the jury to determine the credibility of the witnesses who testified at trial.

{¶67} The majority concludes that the jury clearly lost its way when it believed L.A.'s testimony that Mr. Charlton raped her. When analyzing whether a conviction is against the manifest weight of the evidence, this Court regularly concludes that witness credibility should be determined by the jury. *See State v. Shank*, 9th Dist. Medina No. 12CA0104-M, 2013-Ohio-5368, ¶ 29, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. ("[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.") This Court "must bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses." *State v. Gooden*, 9th Dist. Summit No. 24896, 2010-Ohio-1961, ¶ 20, citing *DeHass* at paragraph one of the syllabus. Further, we have held that "[t]his Court will not overturn the [jury]'s verdict on a manifest weight of the evidence challenge only because [it] chose to believe certain witness' testimony over the testimony of others." *Shank* at ¶ 29, quoting *State v. Brown*, 9th Dist. Wayne No. 11CA0054, 2013-Ohio-2945, ¶ 42. *See also In re C.M.*, 2d Dist. Montgomery No. 21363, 2006-Ohio-3741, ¶ 41 ("An appellate court should not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict.")

{¶68} I agree that there were inconsistencies in L.A.'s testimony. However, "[e]ven though the evidence is inconsistent, inconsistencies do not render [a] defendant's conviction against the manifest weight of the evidence. It is the jury's province to take note of the inconsistencies and resolve or discount them accordingly." (Citation omitted.) *Gooden* at ¶ 30.

The victim's testimony was consistent and adamant on the fact that Mr. Charlton raped her. Further, there was physical evidence in the form of redness and bruising on her wrist attested to by all the witnesses that corroborated L.A.'s testimony that Mr. Charlton forcibly pulled her into a bedroom and restrained her during the rape. I agree with the majority's statement that the critical inquiry is the reasonable inferences that could be drawn from L.A.'s testimony. I do not, however, agree that "[t]here could not have been two more different stories about what happened at L.A.'s house." The only witnesses who testified were L.A., her son, and her daughter. I cannot conclude from a review of the record that there were two stories before the jury. If the majority means that both of the two very different stories came from the victim, I cannot conclude that her testimony was so incredulous that no reasonable trier of fact could have believed the portion of her testimony which was related to the elements of the crime.

{¶69} The trial court judge was concerned about the victim's credibility. As the majority points out, he stated as much on the record. However, I feel this statement evidences an understanding which underscores the basic directive that once engaged to do so, the jury makes the credibility determinations and that the state of the law is that we, as judges, do not make these findings when a litigant or defendant has exercised the right to a trial by jury. It, therefore, would be improper, I feel, to use the trial judge's statement as a means of bolstering a conclusion that the jury lost its way in crediting L.A.'s testimony about the rape.

{¶70} I would conclude that the issue of L.A.'s credibility lies within the province of the jury who observed her demeanor while being questioned at length about the circumstances of the rape by her assailant himself. After a careful review of the trial testimony, I cannot conclude that the jury "lost its way." Rather, I would conclude that the jury found L.A. to be credible on the salient facts related to the elements of the crime of which Mr. Charlton was charged. This case

did not involve multiple witnesses who testified to varying accounts of the attack. Further, I cannot agree that the jury lost its way in the face of physical evidence that corroborates the victim's testimony and when the testimony from the witnesses does not conflict. After thoughtful deliberation, as evidenced by the fact that the jury was deadlocked for an undetermined amount of time before reaching a verdict, received a *Howard* charge, and was instructed on the elements of the crime of rape, it returned a verdict of guilty. I do not believe that this is the "exceptional" case where the evidence weighs heavily against Mr. Charlton's conviction. *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Just as Mr. Charlton has an inviolate right to represent himself, he further has an equally important right to have his case heard by a jury. He chose to exercise those rights here, and no court may stand to remedy that which might be the perceived consequences of his very important choices. Accordingly, I respectfully dissent from that portion of the majority's decision.

APPEARANCES:

JEREMIAH A. CHARLTON, pro se, Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.